UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PEGGY JOYCE FLANAGAN, | ) | Case No. 5:16CV1506 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **REPORT AND RECOMMENDATION** |
| SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Peggy J. Flanagan (hereinafter, "Flanagan" or "claimant") challenges the final

decision of Defendant Commissioner of Social Security (hereinafter, "Commissioner"), denying

her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

## I.  PROCEDURAL HISTORY

On July 30, 2012, Flanagan applied for DIB.  (R. 12, PageID #: 91, 258-261.)  She also

protectively filed an application for SSI on August 6, 2012.  (Id., PageID #: 91, 262-267.)

Flanagan's applications were denied initially and upon reconsideration.  (Id., PageID #: 91, 141-

198.)  Thereafter, she requested a hearing before an Administrative Law Judge ("ALJ").  (Id., PageID #: 233-234.)  Flanagan participated in the ALJ's hearing on September 5, 2014, she was represented by counsel and testified.  (R.12, PageID #: 114-140.)  A vocational expert ("VE") also attended the hearing and provided testimony.  (Id., PageID #: 91, 133-139.)

On December 2, 2014, the ALJ issued his decision, applying the standard five-step sequential analysis and determined that Flanagan was not disabled.  (Id., PageID #: 92-93, 104; see generally 20 C.F.R. §§ 404.1520(a), 416.920(a).)  The Appeals Council denied Flanagan's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R.12, PageID #: 80, 73-75.)  Flanagan next filed a Complaint challenging the Commissioner's final decision.  (R. 1)  The parties have completed briefing in this case.  Flanagan raises three primary issues for judicial review, arguing the following: (1) the ALJ erred as a matter of law by failing to account adequately for the effect fibromyalgia had on Flanagan's functional abilities, (2) the ALJ erred as a matter of law by rejecting the opinion from treating physician Dr. Stetler, and (3) the ALJ's credibility determination is not supported by substantial evidence.  (R. 13.)


## II.  PERSONAL BACKGROUND INFORMATION

Flanagan was born on April 20, 1977, and was 32 years old as of her alleged disability onset date.  (R.12, PageID #: 102, 288.)  She is considered a younger person for Social Security purposes.  See 20 C.F.R. §§ 404.1563(c).  Flanagan completed twelfth grade, and is able to communicate in English.  (R.12, PageID #: 103, 302.)  She has past relevant work as a fast food worker.  (Id., PageID #: 102, 290, 303.)

### III.  RELEVANT MEDICAL EVIDENCE[1]

#### A.  Treatment Records

Disputed issues will be discussed as they arise in Flanagan's brief alleging errors by the ALJ.  Flanagan applied for DIB on July 30, 2012, and she listed the following physical or mental conditions that limit her ability to work:  "mild degenerative disc disease, bulging disc, fibromyalgia, osteoarthritis."  (R.12, PageID #: 91, 258-261, 301.)  During the September 5, 2014 hearing, Flanagan testified that her most significant problem was "pain and the pressure that I have in my back."  (Id., PageID #: 122.)  Flanagan testified that her back condition affects her by "send[ing] numbness in the front part of my legs, cramping, pressure in the lower back."  Also, it causes her anxiety, because she states she can no longer do her normal activities.  (R.12, PageID #: 123.)

Flanagan testified that she had back surgery in July 2013, but it did not alleviate her condition.  (Id., PageID #: 124.)  She still experiences pain, numbness, and pressure, and she has a pinched nerve in her lower spine.  (Id.)  Flanagan testified that her other problems were "anxiety, depression, fibromyalgia."  (Id.)  She further stated that she had asthma, which was well controlled by medication.  (Id., PageID #: 126.)  During the hearing, Flanagan also testified that she has had fibromyalgia for twenty years[2], but that, since about 2007, it has become worse.

---

[1]  The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.

[2]  The record appears unclear regarding the original alleged diagnosis.  During her mental disability evaluation, Flanagan told the state agency consultant, psychologist Michael Harvan, Ph.D., that she had been diagnosed with fibromyalgia in 1993.  She told him she was unable to recall the name of the pertinent doctor who provided that diagnosis, however.  (R. 12, PageID #: 480.)

When she has a fibromyalgia attack, according to Flanagan, it is hard to grip things with her hands.  She reported her hands and muscles ache, and she cannot squeeze or hold anything.  (R.12, PageID #: 127.)

Flanagan's medical treatment records show persistent problems with back pain, which is uncontested and need not be recited in detail here.  As early as July 2010, Flanagan reported left shoulder pain with stiffness and lower back pain with stiffness.  (Id., PageID #: 489.)  After an examination, Prasanna Soni, M.D., diagnosed Flanagan with shoulder pain, adhesive capsulitis of the shoulder, lumbar spondylosis without myelopathy, and morbid obesity.  Dr. Soni prescribed pain medication and stretching exercises.  (Id., PageID #: 491.)

On referral from her primary care physician, Christopher Stetler, D.O., Flanagan presented to the Pain Center at Affinity Medical Center, on February 8, 2011.  Gamaliel Batalla, M.D. noted that Flanagan was thirty-three years old and presented with "a longstanding history of neck and left shoulder pain."  (R.12, PageID #: 389.)  Flanagan reported she had been "previously diagnosed to have fibromyalgia," which had been aggravated by a motor vehicle accident "sometime in 2009."  (It does not appear that any medical records have been submitted for medical treatment at the time of the 2009 accident, or documenting the alleged pre-accident diagnosis of fibromyalgia.)  Medication and rest helped with pain symptoms.  (Id.)  She advised Dr. Batalla she had received various prescriptions—Neurontin, Vicodin, Zanaflax, Robaxin—for her pain symptoms, with varying effectiveness; and she was taking Percocet, which gave her nausea.  (R.12, PageID #: 389.)

Flanagan was working at McDonald's, and Dr. Batalla's review of systems was "positive for fatigue and depression," but he determined that the "[r]est of review of systems is unremarkable."  (Id., PageID #: 390.)  Dr. Batalla's examination revealed increased pain on

range of motion in both shoulders, especially the left.  (Id.)  An MRI showed probable "mild supraspinatus and infraspinatus tendinopathy without obvious rotator cuff tear."  (Id.)  Dr. Batalla advised claimant that "her pain is most likely multifactorial with fibromyalgia contributing to most of it."  (Id.)  His recommended treatment included medication for chronic pain, muscle relaxant, regular sleep, physical therapy, and exercise.  (Id.)  He further advised that she stop smoking and lose weight; and that she return for a follow-up visit in one month.  (Id.)

At a September 26, 2011 visit to Dr. Stetler, Flanagan sought treatment for a urinary tract infection and advised the nurse she had back pain, along with UTI symptoms, that she had lost her insurance, and was off all her medications because she could not afford them.  (R.12, PageID #: 462.)  She reported severe anxiety, and "need[ed] something to help with it."  (Id.)  The noted history indicated that "Fibromyalgia is main cause of much of her pain." (R.12, PageID #: 461.)

On January 15, 2012, Flanagan appeared at Mercy Hospital with complaints of coughing and "some development of back pain" over the past several days.  She was given an antibiotic for her chest cold.  (Id., PageID #: 380-381.)

On May 19, 2012, Arpad Batizy, M.D. noted tenderness in Flanagan's lower back region after Flanagan reported that she had been bending over the bathtub and experienced sudden low back pain with radiation down her thighs.  (R. 12, PageID #: 376.)  Flanagan stated that she did not have back pain in the past, except occasionally, and that tended to go away readily.  (Id.) She received Toradol IM, and was prescribed Naproxyn, Flexeril, and Percocet.  She was instructed to follow up with her physician in a few days.  (R. 12, PageID #: 376.)

On May 21, 2012, Flanagan visited her primary care physician, Christopher Stetler, D.O, complaining of pain and constant pressure in her lower back.  She reported pain into her buttocks and the front of her legs, with a burning sensation.  Her "Past Medical History" was stated as

"Neck Spasm; Unspecified Sleep Disturbance; Depression; Arthritis; and HPV," with no changes required.  (Id., PageID #: 452.)  Flanagan reported that, while bending over the bathtub washing her son, she was not able to straighten up, and noticed her hands were going numb.  (Id., PageID #: 453.)  Dr. Stetler reported claimant was in no acute distress, although she had pain in the lower central part of her back, and a straight leg raise caused pain into her foot and the side of her back.  (Id., PageID #: 453.)  Dr. Stetler prescribed Naproxen, Flexeril, Percocet, and a Methylprednisolone Pak.  (Id., PageID #: 454.)  He also provided a note, excusing Flanagan from work (without explanation) from May 21, 2012, to June 14, 2012.  (Id., PageID #: 451.)

Flanagan began physical therapy the next day, May 22, 2012.  (R. 12, PageID #: 395.)  At a June 6, 2012, office visit to Dr. Stetler, Flanagan reported that she had five treatments of physical therapy, but the back pain was getting worse with therapy and her medications were ineffective.  (Id., PageID #: 447.)  Dr. Stetler adjusted her medications.  (Id., PageID #: 449.)  He also provided Flanagan with a note excusing her from work (without explanation) from June 6, 2012, to July 6, 2012.  (Id., PageID #: 446.)  She was subsequently provided a work excuse for the period June 18, 2012, to July 12, 2012.  (Id., PageID #: 444.)

On July 11, Flanagan phoned the doctor's office, which was described as follows:  "Work excuse needs extended, showed up late to pain management, states she messed up the times.  Is asking if you will extend her work excuse until she can get back in to see them, which is July 24th."  Dr. Stetler provided a note excusing her from work from July 12, 2012, to July 24, 2012, and said she may return to work once cleared by a specialist.  (R.12, PageID #: 439, 440.)

On July 24, 2012, over one year after her first visit to the Pain Center, Flanagan returned for a second visit.  Dr. Batalla stated that Flanagan had "a working diagnosis of fibromyalgia and left shoulder pain."  (Id., PageID #: 392.)  He noted that she had not taken two of the three

medications he prescribed for her.  Flanagan reported increased pain in her lower back, with burning, shooting pain in her buttocks, and weakness and numbness in both legs.  There was diffuse tenderness all over her body.  An MRI of the lumbar spine showed mild degenerative disc disease at L4-L5 and L5-S1, but no central or foraminal stenosis, and Dr. Batalla expressed doubt that the lumbar spine had any significance to her reported pain symptoms.  He explained that it was normal to have some mild disc degeneration, as shown in the MRI results as part of the aging process, and they discussed medication options.  Dr. Batalla informed Flanagan that he was not in a position to impose any work restrictions, in response to Flanagan's inquiry, because it was only the second time he had seen her.  He recommended she return for a follow-up visit in a month or two.  (R.12, PageID #: 392.)

On July 25, 2012, Dr. Stetler gave Flanagan another excuse from work between July 24, 2012, and August 12, 2012, indicating she may return to work on August 13, 2012, without restrictions.  (R.12, PageID #: 433.)  At an August 10, 2012, follow-up visit for "her back issues, medications and about work," Flanagan reported she was on Lyrica and wondered if it was causing headache and a "spacey" feeling.  (Id., PageID #: 429, 431.)  She also complained of muscle cramps and muscle weakness, reporting that her arms felt weak and she has trouble gripping things.  (R.12, PageID #: 429.)  Dr. Stetler adjusted her medications, and stated she needed to "stay off of work for two more weeks while she is starting Lyrica and trying to decrease pain."  (Id., PageID #: 431.)  In addition, Dr. Stetler advised that Flanagan needs to increase activity because it will reduce pain symptoms.  (Id., PageID #: 432.)  He provided a note excusing her from work August 10, 2012, to August 26, 2012, and said she may return to work on August 27, 2012, without restrictions.  (Id., PageID #: 428.)  Thereafter, Flanagan continued to report lower back pain and left shoulder pain.  *See, e.g.*, R. 12, PageID #: 414 (August 28,

2012, visit to Dr. Stetler); PageID #: 500 (January 9, 2013, visit to Dr. Soni); PageID #: 511 (June 11, 2013, visit to Scot D. Miller, D.O.).

Flanagan had back surgery on July 24, 2013.  She was diagnosed with left L5-S1 stenosis and radiculopathy, left L5 and S1; degenerative lumbar disc disease, L5-S1 with foraminal disc protrusion, left L5-S1; and low back pain and degenerative disc disease with foraminal stenosis, left L5 and S1.  Dr. Miller performed "Left L5 and S1 unilateral laminectomy with partial facetectomy, foraminotomy, and lateral discectomy, L5-S1."  (R. 12, PageID #: 767.)

At an August 7, 2013, follow-up exam, Flanagan reported to Kathleen Opsitnick, CNP that she was doing well for about one week after surgery, but then developed recurrent radicular symptoms on her left side, a pressure from her buttocks down to her legs.  She conceded she had been rather sedentary since the surgery, and she had continued smoking.  (Id., PageID #: 763.) Flanagan began going to physical therapy later in August 2013.  (Id., PageID #: 768.)

On September 13, 2013, she advised the physical therapist that she had difficulty with P/T exercises because of increased fibromyalgia symptoms.  (Id., PageID #: 658.)  Flanagan did not appear for therapy appointments on September 16, 18, and 20.  (R. 12, PageID #: 655-656.)

Flanagan continued to report lower back and leg pain, throughout this period.  *See, e.g.*, R. 12, PageID #: 729 (October 29, 2013 follow-up with NP Opsitnick); PageID #: 725 (March 6, 2014 visit to NP Opsitnick).  An MRI was performed on May 5, 2014, which revealed some new left paracentral disc protrusion with cerpalad migration at L5-S1, associated with the dorsal laminectomy.  There was minimal compression on the ventral thecal sac, without canal stenosis or mechanical nerve root impingement.  (R. 12, PageID #: 642.)  Flanagan had a physical therapy evaluation the next day, at which she reported low back pain and radiating pain and numbness in her legs.  (Id., PageID #: 784.)

The month before her hearing, on August 6, 2014, Flanagan had a follow-up visit with Dr. Stetler at Mercy Primary Care Lake.  (R. 12, PageID #: 699.)  She reported improvement in her back pain, with medication.  She had gall bladder surgery on July 24, 2014, and reported that she had quit smoking in January 2014.  (Id., PageID #: 700.)  Her medications for low back pain were modified and updated.  (Id., PageID #: 702.)

### B.  Medical Opinions Concerning Claimant's Functional Limitations

On November 8, 2012, Dimitri Teague, M.D., state agency medical consultant, assessed Flanagan with exertional and postural limitations based on a lumbar MRI that revealed mild degenerative disc disease, adhesive capsulitis in her left shoulder, and morbid obesity.  (R.12, PageID #: 152.)  Dr. Teague determined that Flanagan could stand or walk about six hours in an eight-hour workday, and could sit, with normal breaks, for about six hours as well.  (Id.)  Dr. Teague indicated that Flanagan could perform light work, but she could never crawl or climb ladders, ropes or scaffolds; could occasionally stoop and crouch; and could frequently kneel and climb stairs or ramps.  Dr. Teague stated that Flanagan could occasionally reach, including overhead, with her left arm.  (R.12, PageID #: 151-152.)  However, Dr. Teague found claimant's handling and fingering to be unlimited.  (Id., PageID #: 153.)  Dr. Teague indicated that Flanagan's physical RFC limited her to light, unskilled work.  (Id., PageID #: 157.)

The treating physician, Dr. Stetler, provided an assessment of Flanagan's residual functional capacity on September 30, 2013.  (R.12, PageID #: 526-527.)  Dr. Stetler diagnosed Flanagan with "lumbago [with] radiculopathy, fibromyalgia, neck/shoulder pain, depression."  (Id., PageID #: 526.)  He assessed that Flanagan could: walk one to two blocks without rest or significant pain; sit and stand/walk for thirty minutes (each) at one time; sit for three hours in an

eight-hour workday; lift ten pounds occasionally and less than ten pounds frequently; and never

lift weights of twenty pounds or more.  He did not indicate the total time that she could sit or

stand in an eight-hour workday. (Id., PageID #: 526-527.)  The only limitations in repetitive

reaching, handling, or fingering that Dr. Stetler identified were that Flanagan could reach with

her left arm 20% of an eight-hour workday.  He specifically indicated that she could use her

hands to grasp, turn, or twist objects with either hand 100% of a workday, and also could use her

fingers for fine manipulation for 100% of the workday.  (Id., PageID #: 527.)  He noted that

Flanagan would require unscheduled breaks every hour for 15-20 minutes, would miss work

once or twice per month in warm weather, and three or four times per month in cold weather.

(Id., PageID #: 526-527.)  Dr. Stetler opined that Flanagan was not physically capable of

working eight hours per day, five days per week on a sustained basis.  (R.12, PageID #: 527.)

On reconsideration, state agency consultant Robert Klinger, M.D., on March 4, 2013,

largely affirmed Dr. Teague's RFC assessment, but also determined that Flanagan could

occasionally kneel and crawl.  (R.12, PageID #: 172.)  Again, Dr. Klinger noted that Flanagan's

left arm reach was limited, in front or laterally.  (Id., PageID #: 173.)  He also determined

Flanagan's handling and fingering to be unlimited.  (Id.)  Dr. Klinger concluded that claimant

was not limited to unskilled work because of her impairments, but Flanagan's physical RFC

limited her to light work.  (R.12, PageID #: 176.)

## IV.  TESTIMONY OF VOCATIONAL EXPERT

A vocational expert ("VE") attended the hearing and provided testimony.  (R.12, PageID

#: 133-139.)  The ALJ determined that Flanagan had past relevant work as a fast food worker.

(Id., PageID #: 102, 134.)  The ALJ posed the following hypothetical question to the VE:

> My first hypothetical if you could, could assume an individual of the same age, education, and work experience as the claimant; this individual would be able to work at the light level; she could never climb ladders, ropes, or scaffolds; she could frequently climb ramps or stairs; occasionally stoop, kneel, crouch, and crawl; she could occasionally reach overhead with the left upper extremity; she could never use moving machinery, be exposed to unprotected heights or do commercial driving; she can perform simple, routine, and repetitive tasks; she's limited to a work environment free of fast-paced production requirements involving only routine workplace changes.

> Would such an individual be able to perform the claimant's past work?

(R.12, PageID #: 134-135.)  The VE answered that the past work, as the claimant performed it, was greater than light work, so her past work would not be available.  (Id., PageID #: 135.) Thereafter, the ALJ asked whether there were other unskilled occupations that exist in the national economy that such a person could perform.  (Id.)  The VE responded that there would be light, unskilled work and provided several representative occupations.  First, assembler of small products, DOT 739.687-030, light exertion, with 10,000 jobs in Ohio, 3,500 in northeast Ohio, and approximately 217,000 in the national economy.  Next, inspector and hand packager, DOT 559.687-074, light exertion, unskilled, with 235,000 jobs in the national economy, 22,500 in the state of Ohio, and 4,500 in northeast Ohio.  Further, electronics worker, DOT 726.687-010, light exertion, unskilled, with 240,000 jobs in the national economy, 13,000 in the state, and 3,500 in northeast Ohio.  (R.12, PageID #: 135.)

The VE testified, in response to the ALJ's second hypothetical question, that he would cite the same jobs if a second hypothetical added "superficial contact meaning no negotiation or confrontation with others."  (Id., PageID #: 135-136.)  The ALJ then proposed a third hypothetical question, modifying the second hypothetical to include a person who could stand and walk about two hours and sit for six hours in an eight-hour workday with normal breaks.

(Id., PageID #: 136.)  The ALJ asked whether such an individual could perform the jobs the VE had identified.  The VE responded that the jobs could be done standing or sitting at the individual's discretion.  (Id., PageID #: 136.)

In addition, the ALJ asked if there were other sedentary jobs that such an individual could perform.  The VE replied that there were multiple jobs at the sedentary level, such as a touch-up screener, inspecting electronic assemblies, DOT 726.684-110, sedentary, unskilled wit 158,000 such jobs nationally, 5,200 in Ohio and 1,700 in northeast Ohio.  (Id.)  Next, he identified a job tending a machine that bonds together electronic components, DOT 726.685-066, sedentary, unskilled, with approximately 110,000 jobs in the nation, 10,000 in Ohio and 2,500 in northeast Ohio.  (Id.)[3]  Third, inspector of wooden products, DOT 669.687-014, sedentary and unskilled, with approximately 120,000 positions in the nation, 11,000 in Ohio, and 2,500  in northeast Ohio.  (R.12, PageID #: 137.)

The ALJ posed a fourth hypothetical, the same as the third, except this individual would need to alternate positions between sitting and standing every 30 minutes.  The question was whether the person would be able to perform the light jobs the vocational expert had identified.  The VE answered that the person would be able to perform the light work, and the sedentary jobs as well, so long as the person was not off task more than nine minutes, that is, fifteen percent of the time.  (Id., PageID #: 137-138.)

The fifth hypothetical involved a person who could frequently handle and finger objects.  The vocational expert testified that such a person could perform all the jobs discussed, except for the assembler of small products.  Instead, the VE substituted another job, which was an

---

[3] In response to the ALJ's further inquiry, the VE clarified that tending the bonder machine would not fall into the category of hazardous moving machinery.  (R.12, PageID #: 137.)

assembler of electrical accessories, DOT number 729,687-010, light and unskilled.  There are 244,000 jobs in the nation, 9,000 in the state of Ohio, and 3,500 in northeast Ohio in that category.  (R.12, PageID #: 138.)

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his December 2, 2014, decision:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2. The claimant has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: obesity, disc herniation with neural compression, tendonitis of the left shoulder, personality disorder, and depression (20 CFR 404.1520(c) and 416.920(c)).

The record demonstrates that the claimant is limited in her ability to perform basic work related activities because of her medically determinable impairments. Therefore, the claimant has established "severe impairments" within the meaning of the regulations.

The record shows that the claimant has been diagnosed with asthma, gastroesophageal reflux disease, chronic bronchitis, allergic rhinitis, hypersomnia, sleep apnea, fibromyalgia, urinary tract infection, upper respiratory infection, cerumen impaction, syncope, arthritis, otitis externa, right hand strain, and carpal tunnel syndrome.  However, the evidence indicates that these conditions impose only minimal limitations on the claimant's ability to perform basic work activities. Therefore, they are non-severe impairments.  Nevertheless, despite the non-severe finding, any limitations caused by such impairments are incorporated in the residual functional capacity set forth below.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can stand and walk for two hours and sit for six hours in a workday with normal breaks.  She can never climb ladders,

13

ropes, or scaffolds.  She can frequently climb ramps or stairs.  She can occasionally stoop, kneel, crouch and crawl.  The claimant can occasionally reach overhead with the upper left extremity.  She must avoid the use of all moving machinery, commercial driving, and exposure to unprotected heights.  She can perform simple, routine, and repetitive tasks.  The work environment must be free of fast-paced production requirements and routine workplace changes.  The claimant can have superficial contact, defined as no negotiation or confrontation with others.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 20, 1977, and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R.12, PageID #: 93-94, 96, 102-104.)


VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security

Income benefits only when she establishes disability within the meaning of the Social Security

Act.  See 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform

"substantial gainful employment by reason of any medically determinable physical or mental

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination regarding disability. See 20 C.F.R. §§ 404.1520(a), 416.920(a); Heston v. Commissioner of Social Security, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. Id. § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. Id. § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. Id. § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. Id. § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997).

Wilson v. Comm'r of Social Security, 378 F.3d 541, 548 (6th Cir. 2004); see also 20 C.F.R. § 416.920(a)(4).

## VII. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. See

Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed.  Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).  This court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989).


VIII.  ANALYSIS

Flanagan raises three issues for judicial review, arguing:

1.  The ALJ erred as a matter of law in failing to adequately account for the evidence of the effect fibromyalgia had on Flanagan's functional abilities.

2.  The ALJ erred as a matter of law in rejecting the opinion from treating physician Dr. Stetler.

3. The credibility determination is not supported by substantial evidence.

(R. 13.)

### A.  Fibromyalgia

Flanagan first argues that the ALJ erred by failing to account adequately for the evidence showing the effect fibromyalgia had on her functional abilities.  (R. 13, PageID #: 796-799.)  She contends that the ALJ relied primarily on the objective findings of various examinations, and that his analysis is almost devoid of discussion of the effect of Flanagan's fibromyalgia.  (Id., PageID #: 797.)  She argues that it is not clear whether the ALJ considered "the true documented impact" of her fibromyalgia when assessing her RFC, even in the context of finding it to be a non-severe impairment.  (R. 13, PageID #: 796.)  The ALJ's decision, according to Flanagan, is not supported by substantial evidence and is contrary to applicable legal standards, because the ALJ did not analyze the effect of her fibromyalgia when making his decision.  (Id., PageID #: 799.)

The Commissioner asserts that the ALJ reasonably found Flanagan's fibromyalgia to be a non-severe impairment, and maintains that Flanagan does not expressly contest that finding.  Nevertheless, the ALJ explicitly indicated that he would consider any limitations caused by Flanagan's non-severe impairments, which included fibromyalgia, in his RFC assessment.  (R. 15, PageID #: 817, citing tr., PageID #: 94.)   The ALJ concluded that the record showed that Flanagan had been diagnosed with fibromyalgia, among several other conditions.  (R. 12, PageID #: 94.)  But, as the ALJ stated, "the evidence indicates that these conditions impose only minimal limitations on the claimant's ability to perform basic work activities," and thus, fibromyalgia is a non-severe impairment.  (Id.)  The ALJ determined that the RFC incorporated any limitation caused by fibromyalgia.  (Id.)

The Commissioner further asserts that the ALJ's decision "comprehensively detailed the medical evidence relevant to Plaintiff's fibromyalgia in the RFC assessment, noting clinical observation of tender points and Plaintiff's subjective complaints of diffuse body pain."  (R. 15,

17

PageID #: 818; *see, e.g.*, R. 12, PageID #: 98 (noting diffuse tenderness all over her body; touch sensitivity and numbness); PageID #: 99 (tenderness throughout spine, with trigger points; increased tenderness with activity). Flanagan only complained sporadically about her fibromyalgia after 2011, as noted by the ALJ. (R. 15, PageID #: 818, citing tr., PageID #: 97-99.) Although Flanagan complained of fibromyalgia pain in February 2011, she did not return to the pain management specialist again until July 2012. (R. 15, PageID #: 818-819, citing tr., PageID #: 389, 392.)

The medical record shows that Flanagan's primary complaints were related to her lumbar impairment, which dominates the medical evidence since her back injury in 2012. While treating physicians found fibromyalgia to be a primary contributor to her pain in 2011, by 2012 the overwhelming majority of her complaints centered on her lumbar impairment and related symptoms. (R. 15, PageID #: 818, citing record.) The Commissioner argues: "Given the steady focus on the lumbar impairment by Plaintiff and her physicians, the ALJ cannot be faulted for following suit." (R. 15, PageID #: 819.) Flanagan stated, during her administrative hearing, that the pain and pressure in her back was her most significant problem. (R. 12, PageID #:122.)

Further, the Commissioner argues that Flanagan merely states that her fibromyalgia caused her pain, without identifying any specific physical limitations that should have been incorporated into the RFC as a result of fibromyalgia. The Commissioner states that a diagnosis of fibromyalgia does not necessitate a finding of disability, and Flanagan's complaints of pain alone do not compel RFC restrictions. (R. 15, PageID #: 819.) The Commissioner stresses that Flanagan has the burden to present evidence showing she is disabled (R. 15, PageID #: 819, citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)), and Flanagan has not presented medical evidence demonstrating that her fibromyalgia caused limitations beyond those the ALJ

incorporated into his restricted RFC, nor does she cite clinical evidence that the ALJ failed to consider.  (R. 15, PageID #: 819; see, e.g., R. 13, PageID #: 798-799.)

The Sixth Circuit has recognized that fibromyalgia can be a severe impairment.  Davila v. Commissioner, 993 F. Supp.2d 737, 754 (N.D. Ohio 2014) (citing Rogers v. Commissioner, 486 F.3d 234, 243 (6th Cir. 2007)).  Because of the nature of fibromyalgia, application of the usual disability analysis is challenging.  Swain v. Commissioner, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003).  Unlike many medical conditions, fibromyalgia is not amenable to objective diagnosis, and medical evidence confirming the severity of the alleged pain almost never exists.  Davila, 993 F. Supp.2d at 755; Swain, 297 F. Supp.2d at 990.

The Commissioner does not contest that Flanagan was diagnosed with fibromyalgia.  However, "the mere diagnosis of an impairment says nothing about the severity of that impairment."  Kutscher v. Commissioner, No. 1:13CV1389, 2014 WL 3895220, at *13 (N.D. Ohio Aug. 8, 2014) (citing Foster v. Bowen, 853 F.2d 483, 489 (6th Cir. 1988)).  Certainly, a diagnosis of fibromyalgia is not equivalent to a finding of disability, or an entitlement to disability benefits.  Stankoski v. Astrue, No. 12-4227, 2013 WL 4045974, at *4 (6th Cir. Aug. 12, 2013) (citing Vance v. Commissioner, No. 07-5793, 2008 WL 162942, at *4 (6th Cir. Jan. 15, 2008)); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

Although Flanagan argues that the ALJ did not properly consider evidence of the effect fibromyalgia had on her functional abilities, she does not actually point to any such evidence.  See generally R. 13, PageID #: 796-799.  Residual functional capacity is meant "to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from."  Stankoski, 2013 WL 4045974, at *4 (quoting Howard v. Commissioner, 276 F.3d 235, 240 (6th Cir. 2002)).  Flanagan points to the diagnosis of fibromyalgia, and the pain which she

claims evidences the condition. She fails to cite to any medical opinion evidence or any treating source finding that would demonstrate that her fibromyalgia causes significant functional work-related limitations. See, e.g., Kutscher, 2014 WL 3895220, at *13. Flanagan must show that she suffers from such a severe case of fibromyalgia as to be disabled from working. Sarchet, 78 F.3d at 307.

When asked at the hearing whether she had any problems using her hands, Flanagan testified, "not too much," although she said when she had an attack of fibromyalgia, "it is hard to hold things[,] like grip things." Flanagan said it happened "maybe a couple of times a week" in warm weather. In cold weather, she claimed it was "almost an everyday thing," that her "hands and muscles really, really ache and I can't squeeze or hold anything." (R. 12, tr., PageID #: 127.)

Since the severity of fibromyalgia cannot be confirmed by diagnostic testing, a physician's opinion depends, in some measure, on an assessment of the claimant's subjective complaints. Although the treating physician's assessment provides input concerning the claimant's credibility, ultimately it is the ALJ's determination whether it has been demonstrated that the claimant's pain is so severe that it imposes limitations rending her disabled. Swain, 297 F. Supp.2d at 990.

The ALJ determined, after careful consideration of the evidence in the record, that Flanagan's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. 12, PageID #: 97.) At an August 10, 2012, follow-up visit to Dr. Stetler for "her back issues, medications and about work," Flanagan complained of muscle cramps and muscle weakness, and reported that her arms felt weak, and she had trouble gripping things. (R.12, PageID #: 429.) Flanagan does not point to other specific medical evidence

indicating any effect fibromyalgia had on her functional abilities.  See generally R. 13, PageID #: 798-799.  She fails to cite to any medical evidence or any treating source finding which would demonstrate that her fibromyalgia causes significant functional work-related limitations.  See, e.g., Kutscher, 2014 WL 3895220, at *13.

The court finds that substantial evidence supports the ALJ's evaluation of Flanagan's fibromyalgia impairment.


B.  Treating Physician

The second issue raised by Flanagan is: "The ALJ erred as a matter of law in rejecting the opinion from treating physician Dr. Stetler."  The ALJ addressed the opinions of Dr. Stetler as follows:

> As for opinion evidence, I give little weight to the notes from claimant's physician, Richard Stetler, D.O., excusing the claimant from work (5F).  Dr. Stetler provided no explanation for why the claimant had to remain off work or any specific functional limitations.  Furthermore, the determination of the ability to work is reserved to the Commissioner or her designees.

(R. 12, PageID #: 100.)  The ALJ also addressed Dr. Stetler's RFC assessment.  (Id., PageID #: 101-102.)  He noted that Dr. Stetler opined claimant had to be allowed to shift positions and to take frequent unscheduled breaks.  (Id., PageID #: 102, citing PageID #: 526.)  The ALJ also indicated that "Dr. Stetler concluded that the claimant was unable to work full-time."  (R. 12, PageID #: 102, citing PageID #: 527.)  The ALJ continued:

> I do not give controlling weight to Dr. Stetler's opinion.  While he treated the claimant, the medical evidence does not support the extreme level of symptoms he described.  Indeed, there was little explanation for why the claimant had to alternate positions or take unscheduled breaks, aside from generalized descriptions of her symptoms.  Furthermore, there is little support in the record for the assertion that the claimant would miss work frequently.  Additionally, the determination of the ability to work is reserved to the Commissioner or her designees.  * * * * *

21

> With respect to the claimant's alleged limitations, I find such assertions only partially credible. She was non-compliant with treatment recommendations at times, including not engaging in a weight loss program and continuing to smoke throughout much of the relevant period, although she testified she recently quit. One would expect that a person with the degree of symptoms that she described would maintain faithful compliance with treatment recommendations. Moreover, the medical record did not confirm the extreme degree of symptoms that she described.

(R. 12, PageID #: 102.) The ALJ stated that Flanagan's back condition had "improved to some degree" after her surgery. He also pointed out that "she engaged in extensive activities, including providing care for her son, tending to household chores, and traveling to Michigan yearly." The ALJ found these facts "incongruent with the level of dysfunction that she alleged." (R. 12, PageID #: 102.)

Flanagan argues that the ALJ's reasons for rejecting the majority of Dr. Stetler's opinion "are not consistent with either the legal standards related to weighing treating physician opinions or with the evidence." (R. 13, PageID #: 799.) Flanagan contends such an alleged error is harmful because Dr. Stetler's opinion is more limiting than the RFC the ALJ adopted. (R. 13, PageID #: 799.) She claims that the ALJ's assertions that Dr. Stetler's opinion is not supported by the evidence results from the ALJ's failure "to adequately assess the effects of Flanagan's fibromyalgia" and the ALJ did not assess "a significant component of her overall pain process[,]" leaving the ALJ's findings unsupported by substantial evidence. (R. 13, PageID #: 800.)

In addition, Flanagan argues that there is no clear connection between the evidence discussed in the ALJ's opinion and his assertions that the evidence does not support Dr. Stetler's opinion. (R. 13, PageID #: 800.) She claims that "the evidence shows significant objectively

verified symptoms" even after her back surgery. (R. 13, PageID #: 800-01.) Flanagan then outlines her symptoms of pain, as cited in the record.

Again, however, as noted in the discussion of Flanagan's fibromyalgia above, she fails to cite to any medical evidence or any treating source finding that demonstrates fibromyalgia caused significant functional work-related limitations. (R. 13, PageID #: 798-799; *see, e.g.*, *Kutscher*, 2014 WL 3895220, at *13.) A mere diagnosis of fibromyalgia, standing alone, is insufficient to establish disability. *Kutscher*, 2014 WL 3895220, at *13.

As to restrictions on lifting, carrying, and use of her left arm, Flanagan argues the ALJ's assertion that Dr. Stetler's restrictions were unsupported is not consistent with the evidence. Apparently, Flanagan is referring to the following statement: "The evidence reflected that the claimant was limited to sedentary standing levels, but her normal upper extremity strength generally allowed light lifting." (R. 12, PageID #: 102.)

The evidence reflects that Dr. Teague, state agency medical consultant, found that Flanagan could perform light work, and could occasionally reach, including overhead, with her left arm. (Id., PageID #: 151-152.) Dr. Teague determined that Flanagan's physical RFC was consistent with light work. (Id., PageID #: 157.) Agency consultant Dr. Klinger largely affirmed Dr. Teague's RFC assessment, also noting that Flanagan's reach was limited as to her left arm. (Id., PageID #: 172-173.) The regulations specify that "light" work involves lifting no more than twenty pounds at a time, with frequent lifting or carrying of up to ten pounds, while "sedentary" work involves lifting no more than ten pounds at a time. 20 C.F.R. §§ 404.1567, 416.967.

Treating physician Dr. Stetler's RFC assessment opined that Flanagan could lift ten pounds occasionally and less than ten pounds frequently, and never lift weights of twenty pounds

23

or more. Dr. Stetler determined that Flanagan could reach with her left arm 20% of an eight-hour workday.  (R.12, PageID #: 526-527.)

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.  Gayheart v. Commissioner, 710 F.3d 365, 375 (6th Cir. 2013); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  This doctrine, often referred to as the treating physician rule, is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are sometimes well suited to provide a complete picture of the individual's health and treatment history.  Id.; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  Gayheart, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  In other words, treating physicians' opinions are only given deference when supported by objective medical evidence.  Vance, 2008 WL 162942, at *3 (citing Jones v. Commissioner, 336 F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  Gayheart, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s).  Blakley, 581 F.3d at 406; Vance, 2008 WL 162942, at *3.  Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating

24

physician's opinion, and the reasons for that weight.  Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Winning v. Commissioner, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

Here, the ALJ's decision addressed the medical opinion evidence, and stated that he did not give controlling weight to the opinion of the treating physician, Dr. Stetler, because the medical evidence did not support "the extreme level of symptoms he described." The ALJ indicated, for example, that there was little explanation for why Dr. Stetler stated claimant had to alternate positions or take unscheduled breaks.  (R. 12, PageID #: 102.)  He also found that the record contained insufficient support for the assertion that Flanagan would miss work frequently.  Instead, the ALJ gave weight to the opinions of the state agency medical consultants, because he concluded the record as a whole demonstrated that, despite her physical conditions, Flanagan could perform light work.  (Id., PageID #: 101-102.)

The Commissioner contends it was reasonable for the ALJ to determine the evidence did not support Dr. Stetler's opinion regarding the claimant's need for frequent unscheduled breaks. Although Flanagan points to evidence in the record showing limited range of motion and tenderness in her left arm (R. 13, PageID #: 802), the ALJ notes that Flanagan routinely demonstrated normal arm strength.  (R. 15, PageID #: 823, citing PageID #: 97-100, and citing PageID #: 415, 430, 435, 490, 493, 501.)  The Commissioner also argues that an opinion indicating a claimant would miss work at a work-preclusive frequency is tantamount to a finding of disability, which is a determination reserved to the Commissioner.  (R. 15, PageID #: 822, citing cases.)  Similarly, Dr. Stetler's opinion that claimant would be unable to work full-time is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ sufficiently articulated the reasons for giving little weight to Dr. Stetler's opinion, even though Flanagan argues for a more thorough articulation of the reasoning for not fully credited that opinion. The ALJ considered the record and determined that the medical evidence did not support the extreme limitations Dr. Stetler set forth. Dr. Stetler, as noted by the ALJ, provided little explanation to support why Flanagan would need to alternate positions or that she would frequently miss work. (R. 12, PageID #: 102; see also R. 15, PageID #: 821; 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (the better explanation a source provides for opinion, the more weight); Hall v. Commissioner, No. 04-5572, 2005 WL 2139890, at *5 (6th Cir. Sept. 2, 2005).) Nonetheless, the ALJ presented Dr. Stetler's restrictions concerning alternating positions to the vocational expert, who responded that such a limitation would not impact either the sedentary or the light jobs outlined in the ALJ's step five finding. (R. 15, PageID #: 821, citing PageID #: 137.)

After fully considering the arguments of both parties (R. 13 and 15), and the evidence in the record, the court finds that the ALJ provided good reasons for not providing controlling weight to the opinion of Dr. Stetler (R. 12, PageID #: 526-527). See, e.g., Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407. The ALJ determined that Dr. Stetler's RFC assessment was inconsistent with other substantial evidence in the medical record, and identified the evidence on which that determination was based. (R. 12, PageID #: 100, 102.) See generally 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Gayheart, 710 F.3d at 376; Hall, 2005 WL 2139890, at *5.) The ALJ provided good reasons, for the weight assigned to Dr. Stetler's opinion, which are sufficiently specific and supported by substantial evidence in the record. (R. 12, PageID #: 101-102.) See Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Hall, 2005 WL 2139890, at *5; Winning, 661 F.Supp.2d at 818-819.

26

The court, therefore, finds that the ALJ's decision concerning the weight given to Dr. Stetler's opinion is supported by good reasons and by substantial evidence in the record.

## C.  Credibility Determination

The third issue raised by Flanagan is: "The credibility determination is not supported by substantial evidence."  Flanagan states that the ALJ found that her allegations regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible.  (R. 13, PageID #: 803, citing PageID #: 97, 102.)

According to Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016), evaluating an individual's alleged symptoms entails a two-step process.[4]  First, an ALJ must determine whether a claimant has a "medically determinable impairment" that could reasonably produce a claimant's alleged symptoms.  Id. at *3.  The ALJ's decision clearly found the first step was satisfied and states that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms." (R. 12, PageID #: 97.).  Once step one is satisfied, "[i]n considering the

---

[4] SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the January 28, 2015 hearing.  While there is not unanimity on the issue, the Court applies SSR 16-3p retroactively as it agrees with the rationale of another district court that has addressed the issue. See Mendenhall v. Colvin, No. 3:14-CV-3389, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) ("where new rules merely clarify unsettled or confusing areas of the law, retroactive application is proper" and finding that "SSR 96-7p and SSR 16-3p are substantially similar"); accord Howard v. Berryhill, No. 3:16-CV-318-BN, 2017 WL 551666 at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly semantic."); contra Murphy v. Comm'r of Soc. Sec., No. 1:15-CV-126-SKL, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively).  By its very language, the primary purpose of SSR 16-3p appears to be the elimination of the term "credibility" from policy to clarify that an evaluation of symptoms does not constitute an examination of an individual's character. 2016 WL 1119029 at *1.

intensity, persistence, and limiting effects of an individual's symptoms," an ALJ must "examine the entire case record," including (1) the objective medical evidence; (2) an individual's statements about the intensity, persistence, and limiting effects of symptoms; (3) statements and other information provided by medical sources and other persons; and (4) any other relevant evidence in the individual's case record. SSR 16-3p, 2016 WL 1119029 at *4.  When considering a claimant's own statements about the intensity, persistence, and limiting effects of her symptoms, an ALJ should evaluate "whether the statements are consistent with objective medical evidence and the other evidence."[5] Id.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003); accord Sorrell v. Comm'r of Soc. Sec., 656 Fed. App'x 162, 173 (6th Cir. 2016).  "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ."  Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); Villarreal v. Sec'y of Health & Human Servs., 818 F.2d 461, 463 (6th Cir. 1987) ("[T]olerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded.") (citations omitted).

---

[5] Factors to be considered in evaluating a claimant's symptoms include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication used to treat the pain or symptoms; (5) treatment other than medication; (6) measures other than treatment used to alleviate pain or symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. See, e.g., Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 249 (6th Cir. 2007); Weaver v. Sec'y of Health & Human Servs., 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to personal observation").  "In evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at *9.  Rather, an ALJ's "decision must contain *specific reasons* for the weight given to the individual's symptoms … and be *clearly articulated so the individual and any subsequent reviewer can assess* how the adjudicator evaluated the individual's symptoms." (Id.) (emphasis added).  "While in theory [a court] will not 'disturb' an ALJ's credibility determination without a 'compelling reason,' Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001), in practice ALJ credibility findings have become essentially 'unchallengeable.'" Hernandez v. Comm'r of Soc. Sec., 644 Fed. App'x 468, 476 (6th Cir. 2016) (citing Payne v. Comm'r of Soc. Sec., 402 Fed. App'x 109, 113 (6th Cir. 2010)).

The Commissioner contends that the ALJ provided a reasonable evidentiary basis for his assessment of Flanagan's subjective claims. The ALJ did credit Flanagan's allegations and testimony regarding how her symptoms affect her ability to perform certain activities, by limiting her to a reduced range of light work, including standing and walking for only two hours in an eight-hour work day.  (R. 12, PageID #: 96.)  The ALJ reasonably determined that the objective evidence was consistent with a finding that Flanagan could perform the reduced range of light work with decreased standing and walking.

Contrary to Flanagan's assertion, the ALJ provided sufficient reasoning for not fully crediting her described conditions.  Flanagan asserts that the fact that she was "occasionally non-compliant with treatment recommendations" is not sufficient to merit an adverse credibility finding.  For example, she argues that failure to follow recommendations to lose weight, or quit smoking, is not the same thing as failing to follow prescribed treatment and would have no impact on Flanagan's work-related functioning.  (R. 13, PageID #: 803.)  Yet the ALJ referenced ample evidence in the record, as indicated infra, that supports a finding that she was non-compliant with treatment recommendations.  See Walker, 884 F.2d at 245 (court may examine all evidence in record, regardless of such was cited by decision).

For example, Flanagan asserts that she is disabled by severe persistent pain from fibromyalgia.  See, e.g., R. 13, PageID #: 798.  In early 2011, her treating physician, Dr. Stetler, referred her to Dr. Batalla at the Pain Center.  At a February 8, 2011, visit to Dr. Batalla, he recommended medication for chronic pain, regular sleep patterns, physical therapy, and exercise.  He instructed her to return for a follow-up visit in one month.  (R. 12, PageID #: 390.)  Flanagan, however, did not return in the near term (R.12, PageID #: 392; see also PageID #: 97.)  Rather, Flanagan's next exam with Dr. Batalla occurred on July 24, 2012, over one year after her first visit.  At that time, Dr. Batalla noted that claimant had not taken two of the three medications he had prescribed for her.  (R.12, PageID #: 392.)  Further, as the Commissioner highlights, Flanagan failed to follow-up with physical therapy, which ultimately led to her discharge from therapy in July 2012.  (R. 15, PageID #: 827, citing PageID #: 98, 401.)

Flanagan also argues that the erroneous assessment of the impact of her fibromyalgia is "particularly troublesome."  She contends that the ALJ's assertion that the medical evidence was inconsistent with the alleged level of disability is not supported by substantial evidence.  (R. 13,

30

PageID #: 804.)  Again, as already discussed above, Flanagan fails to cite to any medical evidence or any finding that demonstrates fibromyalgia caused significant functional work-related limitations.  See generally R. 13, PageID #: 798-799.  Although Flanagan stresses fibromyalgia in her brief, she had testified at her hearing that her "most significant problem" was the pain and pressure in her back.  (R.12, PageID #: 122.)  The medical evidence demonstrates that she most often sought treatment for that issue, which was diagnosed as mild degenerative disc disease in the lower lumbar region.  (Id., PageID #: 124, 392.)

In addition, Flanagan contests the ALJ's finding that her daily activities, such as caring for her son and doing household chores, were inconsistent with her allegations of disability.  (R. 13, PageID #: 804-805.)  Although Flanagan disagrees with the ALJ's evaluation, it is proper for the ALJ to consider her daily activities in evaluating credibility.  (R. 15, PageID #: 826, citing Warner v. Commissioner, 375 F.3d 387, 392 (6th Cir. 2004).)  The ALJ determined that these activities were "incongruent with the level of dysfunction that she alleged."  (R. 12, PageID #: 102.)

Flanagan correctly points out that the ALJ's credibility determination must be based on the record as a whole.  (R. 13, PageID #: 805, citing Winning, 661 F.Supp.2d at 825.)  The Commissioner responds that the ALJ also considered the efficacy and side effects of her medications, and the opinions of state agency consultants.  (R. 15, PageID #: 827, citing PageID #: 98, 101.)

The court finds that the ALJ properly evaluated the credibility of Plaintiff's subjective complaints.  (R. 12, PageID #: 96-102); see generally 20 C.F.R. §§ 404.1529, 416.929.  A claimant's subjective allegations of pain or other symptoms alone will not establish that she is disabled.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529(a), 416.929(a).  It is the ALJ's

responsibility to determine the extent to which a claimant is accurately stating her functional limitations.  Walters, 127 F.3d at 531. The ALJ's findings on credibility are accorded "great weight and deference." Id.

The ALJ cited substantial evidence that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not credible to the extent they were inconsistent with the RFC assessment.  (R. 12, PageID #: 96-102.)


RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.


s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge


Date:  May 19, 2017


**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).

32